UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANDREW BOYLE,

        Petitioner,                          Hon. Janet T. Neff

v.                                                      Case No. 1:11-CV-899

MARY BURGESS,

        Respondent.
_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Boyle's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Boyle's petition be **denied**.

**BACKGROUND**

As a result of events which occurred on April 12, 2006, Petitioner was charged with two counts of assault with the intent to commit criminal sexual conduct involving penetration. (Trial Transcript, July 10, 2007, 18). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**David Dwyre**

Dwyre testified that he had been employed for the past fifteen years as a Detective with the Genesee County Sheriff's Department. (Trial Transcript, July 10, 2007, 121). On an unspecified date, Detective Dwyre spoke with Petitioner. (Tr. 121-22). During this conversation, Petitioner "acknowledged that he was struggling with sexual urges." (Tr. 122). Detective Dwyre encouraged Petitioner to contact him "if he felt he would act out on [his] sexual urges." (Tr. 122). Petitioner responded, "okay," but did not thereafter contact Dwyre. (Tr. 123).

**Julie Gatchell**

On the afternoon of April 12, 2006, Gatchell was "home alone." (Trial Transcript, July 10, 2007, 124). At approximately 1:00 p.m., Gatchell heard her doorbell ring. (Tr. 124-25). Gatchell answered her door and observed Petitioner "standing on [her] porch." (Tr. 125). Petitioner asked to speak with "Sonny." (Tr. 125-26). Gatchell responded that "no Sonny lives here." (Tr. 126). After asking Gatchell if she was "sure," Petitioner began walking away from Gatchell's residence. (Tr. 126). Petitioner immediately returned to the porch, however, with his hand held out. (Tr. 126-27). Petitioner stated to Gatchell, "here, I forgot to give you this" at which point he "very quick[ly]" grabbed and "yanked very hard on the screen door." (Tr. 127-28). The door, however, was "locked and held," thwarting Petitioner's attempt at forcible entry. (Tr. 127). Petitioner immediately departed and drove away in a light blue sedan. (Tr. 127, 132). Gatchell telephoned her husband who instructed her to contact the police which she immediately did. (Tr. 127-31). Gatchell later learned that Petitioner, who she did not know at the time of the events in question, resided only six-tenths of a mile away. (Tr. 125, 136).

2

**Kaitlyn Hughes**

As of April 12, 2006, Hughes was 15 years of age. (Trial Transcript, July 10, 2007, 164-65). Hughes arrived home from school that afternoon at approximately 3:00 p.m. (Tr. 165). She was the only person at home that afternoon and after entering the house she locked the door. (Tr. 165). Soon thereafter, Hughes heard somebody knocking on the front door. (Tr. 165-66). Hughes opened the side door and observed Petitioner approaching her. (Tr. 166-67). Hughes recognized Petitioner as living nearby, but Petitioner was not friends with Hughes or any of her family members and Petitioner had never before been to her home. (Tr. 167).

Petitioner approached Hughes and asked if he could use her phone to call his parents to come pick him up. (Tr. 168). Hughes was puzzled by this request because Petitioner could have "just walk[ed] the few feet to his house." (Tr. 168). Hughes told Petitioner that her phone was not working after which she shut and locked the door. (Tr. 168-69). Petitioner did not depart the area, however, but instead began "continuous[ly]" knocking on the door to Hughes' residence. (Tr. 169-70). Hughes became "very scared" and locked herself in the bathroom and began crying. (Tr. 170-72). Hughes telephoned a friend and asked her to drive over. (Tr. 171-72). Hughes' friend arrived a short time later by which time Petitioner had departed the area. (Tr. 171-73).

**Scott Reynolds**

As of April 16, 2006, Reynolds was employed as a Trooper for the Michigan State Police. (Trial Transcript, July 10, 2007, 198-99). On this date, Trooper Reynolds assisted Trooper Martin following Martin's arrest of Petitioner. (Tr. 199-201). After being informed of his Miranda rights, Petitioner agreed to waive his rights and speak with Trooper Reynolds and Trooper Martin.

(Tr. 200-01). Petitioner acknowledged knocking on the door to Julie Gatchell's residence and asking if she knew a particular individual. (Tr. 203). Petitioner acknowledged that he initially walked away from the residence, but immediately returned and "grabbed" and "jerked" the screen door. (Tr. 203).

Petitioner also acknowledged knocking on the door to Kaitlyn Hughes' residence and asking if he could use the telephone. (Tr. 204). Petitioner acknowledged that his request was denied after which he began walking away. (Tr. 204). Petitioner further stated, however, that he then "got another sexual urge" and returned to Hughes' residence and "started banging on the door." (Tr. 204). Petitioner acknowledged that "several times a day" he experiences "sexual urges" which he "sometimes" is unable to control. (Tr. 205-06). Petitioner stated that he was experiencing "sexual urges" when he interacted with Julie Gatchell and Kaitlyn Hughes. (Tr. 205). Petitioner further stated that his "intent" with respect to the incidents in question was "to go into the residence and have forcible sex with Miss Gatchell" and "go in the residence and have forcible sex with Miss Hughes." (Tr. 207, 222).

**Nicole Downer**

Early one evening, the previous April, Downer was driving home when she noticed Petitioner driving the vehicle immediately behind her. (Trial Transcript, July 11, 2007, 233-36). Petitioner was driving with "his arm out of his window" and was "motioning [Downer] to pull over." (Tr. 234). Downer refused to pull over, but instead drove directly home. (Tr. 234-37). Petitioner persisted and followed Downer home, all the while motioning for her to pull over. (Tr. 237-39).

When Downer reached her residence, Petitioner "followed [Downer] down [her]

4

driveway." (Tr. 239). As Downer approached her home, her husband exited the house to greet Downer. (Tr. 240-41). Petitioner stopped his vehicle and asked, "do you know where Perry Road is?" (Tr. 239-40). Downer offered a response and then told her husband, "that guy is really weird and he just followed me all the way from the store trying to get me to pull over." (Tr. 245). In response, Downer's husband recorded the license plate number from Petitioner's vehicle. (Tr. 245). Downer then contacted the police to report the incident. (Tr. 246).

**Ronald Whitney**

As of April 12, 2006, Whitney was employed as a Deputy with the Genesee County Sheriff's Department. (Trial Transcript, July 11, 2007, 250-51). That afternoon, Whitney spoke with Kaitlyn Hughes regarding Petitioner's behavior at her home earlier that day. (Tr. 252). Deputy Whitney thereafter spoke with Petitioner concerning the events in question. (Tr. 252-53). Petitioner stated that he lived with his parents on Washburn Road. (Tr. 253). Petitioner acknowledged that he had approached Hughes' residence, knocked on her door, and asked to use the telephone. (Tr. 253-54). Whitney, who was unaware that Petitioner had also accosted Julie Gatchell earlier that same day, did not believe there were sufficient grounds to arrest Petitioner. (Tr. 254-55). Whitney instead instructed Petitioner to discontinue such "inappropriate" behavior. (Tr. 254).

The following day, Whitney was contacted by a women who reported that she had just driven home and was followed the entire way by a man in another vehicle. (Tr. 256-57). The woman provide Whitney with the license plate number of the vehicle in question. (Tr. 257). A search of vehicle records revealed that the vehicle in question was registered "to the Boyle residence on Washburn Road." (Tr. 257-58).

5

**Aaron Martin**

As of April 15, 2006, Martin was employed as a Trooper with the Michigan State Police. (Trial Transcript, July 11, 2007, 263-64). On this date, Martin spoke with Julie Gatchell and Kaitlyn Hughes concerning their recent encounters with Petitioner. (Tr. 264-69). The following day, Trooper Martin spoke with Petitioner at Petitioner's residence. (Tr. 269).

Petitioner acknowledged going to Julie Gatchell's residence earlier that week. (Tr. 269). Petitioner stated that he "went there to see some old friends." (Tr. 269-70). Petitioner acknowledged that he "tried to open the door" to Gatchell's residence, but insisted that he simply "wanted to give her some garbage that he had in his hand." (Tr. 270). Petitioner acknowledged going to Kaitlyn Hughes' residence later that same day. (Tr. 270). Petitioner stated that he "went there to use the phone. . .to call his parents," despite the fact that his residence was only 200-250 feet away from Kaitlyn Hughes' residence. (Tr. 270-71). Petitioner also acknowledged that he did not leave the premises after Hughes denied his request to use the telephone. (Tr. 271). Petitioner then, unsolicited, mentioned that "he's been having sexual urges." (Tr. 271-72). Trooper Martin, who was unaware of Petitioner's statements to Detective Dwyre, found Petitioner's comments "very odd." (Tr. 271-72).

Martin then spoke with the prosecuting attorney who concluded that there existed probable cause to arrest Petitioner. (Tr. 272-73). Petitioner was arrested and transported to the jail after which he waived his Miranda rights and agreed to speak with Trooper Reynolds and Trooper Martin. (Tr. 273-75). Petitioner admitted that "the last few weeks he's been having extremely strong sexual urges." (Tr. 276). Petitioner stated that he was too embarrassed to speak with his parents about the matter. (Tr. 276). Petitioner said that he considered hiring a prostitute, but

6

"dropped that idea" at his brother's urging. (Tr. 276). Petitioner then stated that he "knew a couple women he worked with. . .that were willing to have sex with him in exchange for cocaine." (Tr. 276). When Trooper Martin asked Petitioner if "he was willing to risk being arrested for buying cocaine just to have sex," Petitioner's response was "without a doubt." (Tr. 276-77).

Petitioner acknowledged that he "was having urges" when he went to Julie Gatchell's residence earlier that week. (Tr. 277). Petitioner acknowledged that he tried to open the door to Gatchell's residence and that if he had gained entry to her house "he was gonna go in and have sex with" Gatchell. (Tr. 277-81). Petitioner acknowledged that he went to Kaitlyn Hughes' residence "for the intent of having sex with" Hughes. (Tr. 281). Specifically, Petitioner said that had Hughes opened the door a second time he "was gonna force his way in and have sex with her." (Tr. 281-82).

Following the presentation of evidence, the jury found Petitioner guilty of two counts of assault with the intent to commit criminal sexual conduct involving penetration. (Trial Transcript, July 12, 2007, 403). Petitioner was sentenced, as an habitual offender, to serve concurrent sentences of 7-20 years. (Sentencing Transcript, August 20, 2007, 20-21). Petitioner appealed his conviction in the Michigan Court of Appeals, asserting the following claims:

    I.    Did the trial court deny Mr. Boyle due process when it denied his motion for directed verdict because there was insufficient evidence that he attempted to commit a battery or did an illegal act that made either woman fear an immediate battery?

    II.    Did the trial court reversibly err under Michigan law and deny Mr. Boyle due process under the Fourteenth Amendment when, over objection, it allowed the prosecutor to introduce Ms. Downer's testimony because the acts involving her were not sufficiently similar to the charged acts to warrant admission under MRE 404(b)?

7

III. Must Mr. Boyle be resentenced because the trial court failed to exercise its discretion in setting the maximum sentence for third offense habitual offender but instead ruled that a doubling of the maximum sentence was set by statute?

IV. Must Mr. Boyle be resentenced as a matter of due process because the sentencing guidelines were erroneously scored as (a) 10 points for OV 4 because there was no evidence either victim may need psychological counseling; (b) 10 points for OV 9 because there was only one victim for each of these separate crimes; (c) 15 points for OV 10 because there was no preoffense predatory conduct; and (d) 25 points for OV 13 because there was no evidence of three crimes against a person?

V. Was Mr. Boyle denied his Sixth Amendment right to effective assistance of counsel when his attorney failed to object to the scoring of OV 9?

VI. Must the order that Mr. Boyle pay $7,000 in attorney fees be vacated because the record shows that he is totally indigent with no foreseeable source of income. Alternatively, this matter must be remanded for a factual determination of whether Mr. Boyle has the financial resources to pay $7,000 in attorney fees and $600 in costs and for an amended judgment of sentence that deletes the present recommendation that the parole board consider whether such fees have been paid?

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Boyle*, 2009 WL 1767589 (Mich. Ct. App., June 23, 2009). Petitioner later moved in the Michigan Supreme Court for leave to appeal this determination. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Boyle*, 774 N.W.2d 693 (Mich. 2009). On August 24, 2011, Petitioner initiated the present action in which he asserts claims I through IV above.

**STANDARD OF REVIEW**

Boyle's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds

unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where

11

state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## **ANALYSIS**

I.        **Sufficiency of the Evidence**

At the close of the prosecution's case, Petitioner moved for a directed verdict. The trial court denied Petitioner's motion. Petitioner argues that this determination was in error because there did not exist sufficient evidence to support his convictions.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

As of the date of the incidents in question, the elements of assault with the intent to commit criminal sexual conduct involving penetration were: (1) an assault; and (2) an intent to commit criminal sexual conduct involving sexual penetration. *People v. Nickens*, 685 N.W.2d 657, 661 (Mich. 2004).

Petitioner does not challenge the sufficiency of the prosecution's evidence with respect to the latter element, but instead only challenges the conclusion that he committed an assault. Under Michigan law, an assault can occur in one of two ways - "either an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." These two types of assault are referred to as "attempted-battery assault" and "apprehension-type assault," respectively. *Id.*

The Michigan Court of Appeals rejected Petitioner's argument that he did not commit the requisite assault, stating:

> Two assaults were established because defendant, in both instances, attempted to commit a battery.
>
> In the first incident, he approached the home of the woman in question, asked to speak to someone named "Sonny," and asked about the name of the road on which the house is located. Then, after turning to leave, defendant turned back, told the woman that he had forgotten to give her something, and suddenly attempted to open the screen door. The woman testified that he "yanked very hard on the screen door." The woman testified that she was "very frightened" by the encounter, which is circumstantial evidence that defendant did not have a benign state of mind when he attempted to enter the home. If defendant's purpose had been truly benign, it is reasonable to expect that such a large degree of fright would not have occurred. The woman also testified that she telephoned her husband because she was so distressed about the incident and that she telephoned the police after her husband advised her to do so.
>
> In the second incident, defendant approached the home of the second woman, asked to come inside to use the telephone, and then, after the

> woman shut the door, persisted in knocking on the door. The woman testified that she was "very scared" by the incident and that it made her cry, which, again, is circumstantial evidence that defendant did not have a benign state of mind when attempting to enter the home. She also testified that she hid in a bathroom while defendant was still present on her premises, that defendant continued knocking for about five minutes, and that she telephoned friends as a result of her distress.
>
> Defendant admitted to the police that he intended to have forcible sex with the women if he had gained entrance to either home.
>
> The above evidence was sufficient to establish that defendant attempted to commit a battery.

*Boyle*, 2009 WL 1767589 at *1-2.

The decision of the Michigan Court of Appeals is consistent with the testimony presented at trial and the relevant legal authority. Thus, the decision by the Michigan courts rejecting this particular claim was neither contrary to, nor involve an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

**II.        Evidentiary Claim**

As discussed above, the prosecution presented evidence from Nicole Downer regarding a contemporaneous incident in which Petitioner followed Downer to her residence. Petitioner alleges that the introduction of Downer's testimony denied him of the right to a fair trial. Petitioner does not allege that Michigan Rule of Evidence 404(b) itself violates clearly established federal law. Any such argument would nevertheless be without merit as the United States Supreme Court has never held that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. *Bey v. Bagley*, 500 F.3d 514, 520 (6th Cir. 2007). Instead, Plaintiff asserts that the inclusion of the specific evidence in question violated his right to a fair trial.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted). Whether the admission of evidence constitutes a denial of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Ege v. Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007).

The Sixth Circuit has found that the improper introduction of evidence violated a criminal defendant's right to a fair trial where the challenged evidence was the only direct evidence linking the defendant to the crime. *See Ege*, 485 F.3d at 374-78. However, where there exists sufficient other evidence of guilt and the challenged evidence is only "peripheral to the case against" the defendant, the Sixth Circuit has found no due process violation. *Collier v. Lafler*, 2011 WL 1211465 at *3 (6th Cir., Mar. 30, 2011). Nicole Downer's testimony was, at most, only peripheral to the case against Petitioner. The testimony by Julie Gatchell, Kaitlyn Hughes, Scott Reynolds, and Aaron Martin was more than sufficient to establish Petitioner's guilt.

The Michigan Court of Appeals rejected Petitioner's claim that the evidence in question was improperly admitted:

> Evidence of defendant's encounter with the third woman was relevant to the establishment of a pattern of behavior over consecutive days in which defendant approached apparently isolated females. In all three incidents, the evidence showed that defendant acted with some persistence. This was at a time when, as he admitted to police, he was struggling with sexual urges. Indeed, he admitted to police that he was having sexual urges when he approached both of his victims and would have forced each woman to have sex with him if he had gained entry to their homes. Citing a 2002 science fiction movie, and asserting that men and women are "wired

16

> differently" with respect how often they think about sex, defense counsel argued in closing at trial that "just thinking about committing a crime is not enough." The other-acts evidence, however, helped to show that defendant was doing more than thinking about his sexual urges. Rather, he was engaging in behavior motivated by, and designed to satisfy, his urges.
>
> Moreover, any danger that the other-acts evidence would be unfairly applied by the jury was effectively alleviated by the trial court's limiting instruction.

*Boyle*, 2009 WL 1767589 at *4.

This conclusion is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

### III. Sentencing Claims

Petitioner asserts two separate claims relating to his sentence. Petitioner first asserts that the trial court "failed to exercise its discretion" when articulating the maximum amount of Petitioner's sentence. Petitioner also argues that the trial court incorrectly scored several of the relevant offense variables resulting in an inaccurate sentencing guidelines score.

#### A. Petitioner's Maximum Sentence

Under Michigan law, assault with the intent to commit criminal sexual conduct involving penetration is "a felony punishable by imprisonment for not more than 10 years." Mich. Comp. Laws § 750.520g. However, because Petitioner had previously been convicted of two or more felonies, the maximum sentence for the convictions in question was not more than 20 years

in prison. *See* Mich. Comp. Laws § 769.11. As noted above, Petitioner was sentenced, as an habitual offender, to serve concurrent sentences of 7-20 years. Petitioner asserts that he is entitled to be relief because the trial court "failed to exercise its discretion" when fashioning his sentence.

Petitioner does not dispute that pursuant to the aforementioned statutes his maximum possible sentence was 20 years in prison. Instead, Petitioner argues that the trial court mistakenly concluded that it was required under the Michigan habitual offender statute to impose the maximum possible sentence. Petitioner is correct that the habitual offender statute does not mandate imposition of the maximum possible sentence. *See* Mich. Comp. Laws § 769.11 ("the court. . .may sentence the person to imprisonment for a maximum term that is not more than twice the longest term prescribed by law. . .or for a lesser term").

Petitioner's claim fails for two reasons. First, as Petitioner's claim implicates state law only it cannot serve as the basis for federal habeas relief. 28 U.S.C. § 2254(a). Second, a review of the sentence proceedings refutes Petitioner's claim. At sentencing, the trial court clearly stated that "the maximum sentence in this matter on both Count 1 and 2 would be *up to* 20 years in prison." (Sentence Transcript, August 20, 2007, 2) (emphasis added). The Michigan Court of Appeals rejected Petitioner's claim thusly:

> In the instant case, the trial court sentenced defendant to "a minimum period of seven years as set by this court, to a maximum period of 20 years as set by statute," on each charge. Defendant argues that this language indicates that the trial court failed to recognize and exercise its discretion in setting the maximum sentence. However, the trial court had previously noted that defendant's status as a third-offense habitual offender resulted in a "maximum sentence in this matter on both Count 1 and 2[of] *up to* 20 years in prison" (emphasis added). The reference to the maximum being "set by statute" should be understood as the court simply drawing attention to its role in determining the minimum sentence under the Legislative sentencing guidelines versus its role in determining the maximum sentence. As

such, defendant is not entitled to resentencing.

*Boyle*, 2009 WL 1767589 at *5.

Petitioner's sentence was entirely consistent with Michigan law. Where a sentence imposed by a state court is consistent with that state's law, the Constitution is implicated only when a "threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Williams v. Lewis*, 2013 WL 3863957 at *3 (C.D. Cal., July 23, 2013) (quoting *Ewing v. California*, 538 U.S. 11, 30 (2003); *see also*, *Dixon v. McGinnis*, 2010 WL 3260459 at *16 (S.D.N.Y., June 9, 2010) (same); *Luckett v. Epps*, 2010 WL 3307094 at *4 (S.D. Miss., July 27, 2010) (same). Petitioner's sentence in this matter is in no way disproportionate to the crimes committed. Accordingly, this claim presents no issue on which habeas relief may be granted.

B. Scoring of the Offense Variables

Petitioner claims that he is entitled to relief because the trial court incorrectly scored several of the relevant offense variables resulting in an inaccurate sentencing guidelines score. Petitioner's claim that the scoring of the relevant offense variables is inaccurate in violation of Michigan law is not cognizable. *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States"); *Coleman v. Curtin*, 425 Fed. Appx. 483, 484-85 (6th Cir., June 6, 2011) (claims that a state court improperly calculated the relevant offense variables is not cognizable in a federal habeas proceeding). Accordingly, this claim presents no issue on which habeas relief may be granted.

19

# **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Boyle's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: October 7, 2013  /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge